# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| DAVID WALTER GRAY | § | |
| v. | § | CIVIL ACTION NO. 6:09cv406 |
| | | (Consolidated with 6:09cv487) |
| HENDERSON COUNTY JAIL, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff David Gray, a former inmate of the Henderson County Jail in Athens, Texas proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his confinement in the jail. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceedings pursuant to 28 U.S.C. 636(c). Gray initially filed two lawsuits, which have been consolidated for all purposes. As Defendants, Gray named the jail physician, Dr. Kenneth Lemmons; four jail nurses, Nikki Mills, Sandy McGaulin, Sandy Murphrys, and Ms. Thompson; and one jail officer, Featherston, who has since been dismissed.

In his complaints and at an evidentiary hearing, Gray stated that he was booked into the Henderson County Jail on August 5, 2009. He told Officer Featherston, the book-in officer, that he had AIDS, and gave him a list of his medications and his doctor's name, as well as the name of his clinic. The next day, he was taken to the clinic at the jail, where he gave Nurse Thompson the same list.

On August 7, 8, 12, and 14, Gray says that he asked Nurse Murphrys about his medication when she brought medicine to other inmates. On August 14, Nurse McGaulin came to the cellblock and verified that Gray was indeed HIV positive. She said that she would call Walgreen's Pharmacy and order his medication.

On August 18, Gray filed a grievance indicating that he still was not receiving his medication. The next day, Nurse McGaulin came to see him with a release form, so that the jail clinic could get his medical records and list of medications from the David Powell Clinic in Austin, Texas. McGaulin told him that she had been unable to contact anyone at the clinic until then and that Gray "should have brought his medications with him."

On August 20, Gray was taken to the clinic in the jail and spoke to the doctor, who said that he would order his medication. Gray says that he finally received medication for HIV on the evening of August 21, 2009.

In his grievance of August 18, Gray says that he told the book-in officer that he was HIV positive and that he needed medication ordered, and that he asked the nurse about it on August 7, 9, 12, and 14. He says that the nurse told him that she would "check on it" but that he has not seen a doctor nor had any blood drawn. He complains that he has not had any medication for 18 days and that the virus could change and become drug resistant, causing him to get sick and die from an opportunistic infection.

On August 21, Gray sent a request to Dr. Lemmons for a high-calorie, high-protein diet because of his AIDS diagnosis. He received no reply, so on September 2, he sent another request to the medical department for a modified diet, and also complaining of a swollen lymph gland in his right armpit. Gray states that he again did not receive a reply, and so on September 11, he asked some officers for assistance in seeing the doctor.

On September 15, Gray says, he was finally able to see Dr. Lemmons. The doctor felt of the lymph gland and said that they would "keep an eye on it," and denied Gray's request for a special diet, saying that Gray would "just have to eat what they give you."

Gray states that his lymph gland became progressively worse over the next several days, and he sent in repeated sick call requests, to no avail. He showed McGaulin and Murphrys the swollen gland on September 21, and they said that they did not know what it was. On September

25, Thompson looked at it and said that she would prescribe an antibiotic, but Gray never received one.

Finally, on September 29, after requesting medical help on a daily basis for almost two weeks, Gray was taken to the clinic, where he saw Dr. Lemmons. He says that the doctor drew blood for viral load and other tests. When the doctor looked at the gland, Gray says, he told the nurses to take Gray to the emergency room.

There, the gland was lanced and packed with gauze. On October 1, Gray was brought back to the hospital for a followup. The doctor told the escorting officer that the wound needed washing every day for a week with hydrogen peroxide. This was never done. Instead, on September 2, Murphrys gave Gray gauze and tape to re-dress the wound, but no hydrogen peroxide wash was done. He told Murphrys that he was losing weight and needed a modified diet, but she told him that "they" were trying to send him to prison so that he could be taken care of. Gray says that he was sent to the Texas Department of Criminal Justice, Correctional Institutions Division on October 6, but he received no medication before going, nor was any medication sent with him. He says that during his two months in the Henderson County Jail, he lost 29 pounds.

The Defendants have been ordered to answer and have done so. They have also filed a motion for summary judgment. Gray has not filed a response to this motion.

In their motion and the attached summary judgment evidence, the Defendants state that Gray was booked into the Henderson County Jail on August 5, 2009. He was noted to be on medications, and "universal precautions" were to be used with him. Gray advised officers at book-in that he had hepatitis and HIV and was on Medicaid. Six medications were listed, as well as the name of Dr. Kathryn Bison at the David Powell Clinic in Austin.

On August 6, a housing assignment checklist was completed, showing that Gray had been assigned to a cell and received inmate property such as a handbook, jail uniform, shoes, and a mattress. The treatment log reflects attempts to reach a previous doctor in Houston.

On August 7, Gray sent an inmate request form seeking a Bible, and one was given to him. The next entry in the records is dated August 14, when the treatment log reflects that Gray's prior doctor had been located. On August 18, Gray requested forms for filing suit, and these were provided.

On August 19, the medical records show that contact was made with the David Powell Clinic, and Gray was seen by Dr. Lemmons. His medication list was reviewed and refilled, and he received an extended-release shot of morphine.

The next day, Gray sent an inmate request form saying that he had forgotten to ask the doctor about his diet. The response was that Gray would be placed on sick call, and he was seen by Dr. Lemmons about his diet.

On August 26, Gray sent in a request asking for anti-fungal cream and antibiotic ointment, and the response was that he would be placed on sick call. The next day, Gray received three packages of antifungal cream. On September 2, he sent an inmate request form regarding a swollen and painful spot under his arm, and also asked about medication he was receiving three instead of four times a day, as well as about his diet. He was seen by medical staff on September 9, and then by Dr; Lemmons on September 11.

On September 15, Dr. Lemmons again saw Gray about his lymph node. At this time, the doctor noted that the node was slightly enlarged, but without tenderness. Lab data were drawn to make sure that there were no untoward changes. Gray expressed concern over receiving three doses of morphine rather than four doses of Kadian, but the doctor determined that three doses of morphine was adequate. On September 16, Gray again complained about not getting four doses of Kadian, but the jail staff noted that this had been switched to three doses of morphine.

On September 17, Gray saw the nursing staff about the swelling. The nursing staff noted that the site looked the same as when he had been seen by Dr. Lemmons. On September 19, he was again seen by the nursing staff and no changes were noted.

On September 21, Gray sent in an inmate request form saying that the swelling had become worse, that he was losing weight, and that he wanted more anti-fungal and antibiotic cream. The response was that he would be placed on the sick call list. On September 24, he again sent in a request form complaining that he had talked to the nurses but they did not tell him when he would get to see the doctor. The nurses told him that day that he was put on the sick call list, and he saw Dr. Lemmons two days later; it was at the September 26 visit that Dr. Lemmons gave orders for Gray to go to the emergency room.

However, the records show that Gray went to the emergency room at East Texas Medical Center in Athens on September 29. His scripts were all refilled, and he was to finish the course of the antibiotic treatment and receive new antibiotics. He was discharged to the jail with instructions and lab work.

The next day, September 30, Gray asked for more food, saying that he was losing weight. He was placed on the sick call list that day. Also that same day, Gray was put in an observation cell because of a "bleeding sore" under his arm.

On October 1, Gray returned to East Texas Medical Center. There, Dr. Figueroa found a "small abscess," and determined that he was able to return to the jail with instructions to complete the antibiotics already prescribed and doing wound care on the abscess. He was to stay in the separation cell because of the open wound. On October 6, Gray was released to the custody of TDCJ.

General Standards for Summary Judgment

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Securities and

Exchange Commission v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1994); General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P.

To avoid summary judgment, the non-moving party must adduce admissible evidence which creates a fact issue concerning existence of every essential component of that party's case; unsubstantiated assertions of actual dispute will not suffice. Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Fifth Circuit has stated that once the moving party has met its burden, the non-movant must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a fair-minded jury that it is entitled to a verdict in its favor. ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995).

Summary judgment should be granted when the moving party presents evidence which negates any essential element of the opposing party's claim, including a showing that an essential element of the opposing party's claim is without factual support. First American Bank & Trust of Louisiana v. Texas Life Ins. Co., 10 F.3d 332, 334 (5th Cir. 1994). The granting of summary judgment is proper if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Caldas & Sons v. Willingham, 17 F.3d 123, 126 (5th Cir. 1994). Once the movant makes this showing, the burden shifts to the non-movant to come forward with evidence sufficient to establish the existence of a genuine issue of material fact. Caldas, 17 F.3d at 126-27.

Although the Court must draw all inferences in favor of the party opposing the motion, an opposing party cannot establish a genuine issue of material fact by resting on the mere allegations of the pleadings. Hulsey v. State of Texas, 929 F.2d 168, 170 (5th Cir. 1991); *see also* Gordon v. Watson, 622 F.2d 120 (5th Cir. 1980) (litigants may not oppose summary judgment through unsworn materials). Similarly, a bald allegation of a factual dispute is insufficient, in itself, to create a genuine issue of material fact. Recile, 10 F.3d at 1097 n.15. A non-movant cannot manufacture a factual dispute by asking the Court to draw inferences contrary to the evidence.

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In short, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists. Hulsey, 929 F.2d at 170, *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Fifth Circuit has stated that once the defendants have shifted the burden to the plaintiff by properly supporting their motion for summary judgment with competent evidence indicating an absence of genuine issues of material fact, the plaintiff cannot meet his burden by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The Court added that "summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant." Little, 37 F.3d at 1075.

The fact that a non-movant failed to respond to a motion for summary judgment is not itself a basis for granting that motion; rather, the movant has the initial burden of proof to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law. John v. State of Louisiana Bd. of Trustees for State Colleges and Universities, 757 F.2d 698, 708 (5th Cir. 1985). Once the movant has done so, the burden then shifts to the plaintiff, who must identify specific evidence in the record and articulate the precise manner in which that evidence supports his claims; the district has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996). As for material facts on which the plaintiff will bear the burden of proof at trial, he must come forward with evidence sufficient to enable him to survive a motion for directed verdict at trial. Stults, 76 F.3d at 656; *see also* Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim). Should the non-movant fail to respond to the motion, the district court may accept the evidence as undisputed,

although a "default" summary judgment is not permitted. *See* Eversley v. Mbank Dallas, 843 F.2d 172, 174 (5th Cir. 1988).

Standards for Medical Care Claims

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute

examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs. In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's

9

advice to transfer Stewart to another facility for physical therapy. Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities. She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour. He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics. He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die. Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen." Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility. The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment. The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

The dissenting opinion argued that Stewart had not received even rudimentary medical care. The dissent asserts that Dr. Dial was told the day after Stewart was discharged from hospital in August of 1994 that he had developed a 25-centimeter (10-inch) stage IV decubitus ulcer, which Dr. Dial apparently had not noticed in five days of treating him. Dr. Dial prescribed a regimen of cleansing, dressing, and antibiotics, but never checked to see if his orders were being carried out or if they were effective. Nor did Dr. Dial review the nurses' notes.

According to the dissent, Dr. Kim found that Stewart had developed multiple decubitus ulcers including a "very deep infection," and gave orders for their treatment. However, the dissent contended that Dr. Kim knew full well that the facility was too understaffed to carry out her orders, but made no effort to carry out a recommendation that Stewart be transferred to a facility where he could receive proper treatment. Finally, the dissent said that the nurses charted numerous symptoms of infection, but Dr. Knutson did not review these notes; although Dr. Knutson observed after Thanksgiving that Stewart had a urinary tract infection, he did not prescribe any antibiotics. Nonetheless, the dissent did not carry the day; the majority concluded that the doctors had provided "active treatment" for Stewart's ailment and that there was no material fact issue to support the requisite deliberate indifference necessary for liability.

Similarly, in Fenlon v. Quarterman, civil action no. 6:07cv532, 2008 WL 637627 (E.D.Tex., March 5, 2008), *aff'd* 350 Fed.Appx. 931, 2009 WL 3444778 (5th Cir., October 26, 2009, *cert. dismissed* 130 S.Ct. 3418 (June 14, 2010), the prisoner had a lump on his neck; he repeatedly asked medical providers whether it was cancer and was told for years that it was not, but this lump was later determined to be a form of cancer known as squamous cell carcinoma. The district court concluded that although the prisoner had suffered a personal tragedy, there was no evidence of deliberate indifference, and dismissed the lawsuit as frivolous. In affirming this dismissal, the Fifth Circuit cited Domino in stating that deliberate indifference is "an extremely high standard to meet," and in determining that the prisoner had not met that standard.

In this case, Gray complains of a delay of approximately two weeks in receiving HIV medication. In Krivan v. Dallas County, civil action no. 3:99cv1560, 2002 WL 83768 (N.D.Tex., January 14, 2002, no appeal taken), the plaintiff, an inmate in the Dallas County Jail, complained that he informed a nurse on January 8, 1999, that his supply of an AIDS medication called Nelfinavir had run out, but he did not receive any more until February 3, 1999. On March 9, 1999, he told a nurse that he needed AIDS medications called AZT and Combivir, but was told that he would "just have to wait for it to arrive from the pharmacy." He complained again eight days later, and was told

11

that there were no HIV medications in stock and that he would have to wait; he finally received these medications on March 20. The plaintiff also asserted that he requested Nelfinavir on June 15, 1999, and then again on June 21, but the nurse told him that she was "too busy." He did not receive the medication until June 24. As a result, the plaintiff contended that he suffered oral thrush, fatigue, skin infections, and a reduced T-cell count.

  The defendants in Krivan sought summary judgment, which was granted by the district court. The court concluded that the relatively brief delays in receiving medication which the plaintiff had suffered did not rise to the level of a constitutional violation, citing Russell v. Enser, 496 F.Supp. 320, 327-28 (D.S.C. 1979), *aff'd* 624 F.2d 1095 (4th Cir. 1980) *and* Ladd v. Hannigan, 1997 WL 153772 (10th Cir., April 3, 1997). The district court also noted that the plaintiff had failed to adduce any evidence that he was physically harmed as a result of the delays in receiving his HIV medication.

  Likewise, Gray has shown only brief delays in the receipt of his medication, akin to those in Krivan. The record shows that the medical staff at the Henderson County Jail tried to contact Gray's doctor in Houston the day after he was booked in, and they made contact with the David Powell Clinic not long thereafter. Gray was seen by Dr. Lemmons approximately two weeks after being booked in to the jail, and medications were prescribed for him. He has not shown that the jail medical personnel were deliberately indifferent to his medical needs as a result of this relatively brief delay. Krivan v. Dallas County, *op. cit.* This claim is without merit.

  Furthermore, as in Krivan, Gray has not shown that he suffered any physical harm as a result of the brief denial of HIV medication. Although he claims that he suffered from a "swollen lymph node," he offers no evidence to show that this condition was connected to the delay in receipt of his medication. The emergency room records do not diagnose the condition as a "swollen lymph node," but rather as a boil. There is no mention in these records of the boil being connected in any way to Gray's HIV infection.

In Krivan, the inmate's bare allegations that he suffered oral thrush, fatigue, skin infections, and a reduced T-cell count as a result of the delay in receiving his medications was held insufficient to overcome the summary judgment evidence. This comports with the Fifth Circuit's holdings that conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence cannot overcome a properly supported motion for summary judgment. Little v. Liquid Air Corp., 37 F.3d at 1075. In the same way, Gray has failed to show that he suffered any physical harm from the brief delay in receipt of his medications. As noted above, nothing in the medical records shows that the boil under his arm was connected to the brief delay in receiving HIV medications.

Although Gray contended that he lost 29 pounds, the summary judgment evidence contains no indication of such a weight loss. At the time of book-in, on August 5, 2009, his weight was listed at 185 pounds. A "Texas Uniform Health Status Update" form, completed by Nurse Murphrys on October 1, 2009, also gave his weight at 185 pounds. While it is true that Gray's sworn pleadings and testimony are summary judgment evidence, the Fifth Circuit has held that a non-movant cannot satisfy his summary judgment burden with "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007). In Mosley v. White, slip op. no. 09-41091, (5th Cir., December 13, 2010), the Fifth Circuit stated as follows:

> In response to White's motion for summary judgment, as previously explained, Mosley provided the district court with his affidavit and those of his co-inmates and his grievance reports. Although we recognize that the affidavits and reports constitute valid summary judgment evidence, Fed. R. Civ. P. 56(c)(4), we have explained that without more, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" and defeat a motion for summary judgment. Douglass v. United Services. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

Similarly, in the present case, while Gray's sworn pleadings and testimony are summary judgment evidence, he presents nothing more than conclusory allegations, speculation, and unsubstantiated assertions regarding any weight loss which he claims to have suffered.

Even assuming that Gray did lose weight, he has not shown that this weight loss was connected to any deliberate indifference on the part of the Defendants. According to Gray's

13

pleadings, the weight loss continued after his medications were resumed, and he fails to show any relationship between the two-week delay in the receipt of his medications and the weight loss. Although Gray requested extra food, he makes no showing that any of the Defendants were responsible for the amount of food he received, or that if such responsibility existed, that the failure to order extra food for him amounted to deliberate indifference rather than merely negligence. Nor can Gray's disagreement with an assessment that he did not need a special diet show that a constitutional violation took place. *See* Norton v. Dimazana, 122 F.3d at 291. This claim is without merit.

Nor has Gray shown any merit to his claims regarding the treatment of the boil. The medical records show that he was seen by Dr. Lemmons on September 11 and September 15 regarding this, and the nursing staff saw him on September 18 and September 19. He was seen again by the nurse on September 24, who set up an appointment with the doctor on September 26. Dr. Lemmons ordered that Gray be taken to the free-world hospital's emergency room, and Gray was seen in the emergency room on September 29 and October 1. The fact that this treatment may not have been to Gray's entire satisfaction does not show that it was deliberately indifferent to his medical needs. Graves v. Hampton, 1 F.3d at 319-20; Mayweather v. Foti, 958 F.2d at 91. As noted above, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d at 181. In this case, Gray was seen several times, including in a free-world hospital, for the boil under his arm, and he received treatment for this condition. His claim on this point is without merit.

## Qualified Immunity

In their answer and motion for summary judgment, the Defendants assert that they are entitled to qualified immunity. The invocation of qualified immunity applies to claims for monetary damages brought against a government official in his individual capacity. The Fifth Circuit has stated that a qualified immunity defense serves to shield a Government official from

civil liability for damages based upon the performance of discretionary functions if the official's actions were reasonable in light of then clearly existing law. Atteberry v. Nocona General Hospital, 430 F.3d 245, 253 (5th Cir. 2005), *citing* Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001).

To prevail in a §1983 lawsuit, a plaintiff must overcome an officer's defense of qualified immunity. *See* McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (noting that when a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense).

The Fifth Circuit has stated that to discharge this burden, the plaintiff must satisfy a two-prong test. First, he must claim that the defendants committed a constitutional violation under current law, and second, that the defendant's actions were objectively unreasonable in light of the law which was clearly established at the time of the actions complained of. Atteberry, 430 F.3d at 253; Kinney v. Weaver, 367 F.3d 337, 349-50 (5th Cir. 2004). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed that his actions were proper. Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted).

In this case, Gray has failed to discharge his burden because he has not shown that any constitutional violations were committed, nor that any of the Defendants acted unreasonably in light of clearly established federal law. The Fifth Circuit has specifically held that the plaintiff's burden of overcoming the qualified immunity defense cannot be discharged by conclusory allegations and assertions. Michaelis v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). Gray's allegations are not sufficient to overcome the Defendants' entitlement to qualified immunity, and so the Defendants' motion for summary judgment should be granted on this basis as well. It is accordingly

ORDERED that the Defendants' motion for summary judgment (docket no. 40) is hereby GRANTED. It is further

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice. Finally, it is

ORDERED that any and all motions which may be pending in this cause are hereby DENIED.

**So ORDERED and SIGNED this 28th day of February, 2011.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE